IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PAUL JACKSON,                    )
                                 )
            Plaintiff,           )
                                 )
    v.                           )        No. 17-cv-2567
                                 )
HARVEY PARK DISTRICT, *et        )
al.*,                            )
                                 )
            Defendants.          )

Memorandum Opinion and Order

Plaintiff Paul Jackson worked as a park maintenance employee
for the Harvey Park District ("HPD" or "District") from 2008 until
he left the District's employment in 2016. The reasons for and the
circumstances surrounding his departure are the subject of this
lawsuit. Jackson charges his former employer, as well as HPD
executive director Kisha McCaskill, HPD Board of Commissioners
("Board") president Anthony McCaskill, and HPD commissioner Eric
Patterson, with unlawfully terminating his employment in violation
of the Illinois Whistleblower Act ("IWA"), 740 ILCS 174/1 *et seq.*
and the First Amendment of the U.S. Constitution. He further
contends that HPD breached an individual employment contract he
had with the District when it fired him without just cause, and he
charges defendants Anthony and Kisha McCaskill (together "the
McCaskills") with tortiously interfering with his contract.
Defendants have moved for summary judgment on all of Jackson's

claims. For the following reasons, I grant in part and deny in part their motion.

I.

The Harvey Park District is a local governmental unit organized under the Illinois Park District Code, 70 ILCS 1205/1 *et seq.*, that manages twenty-two parks throughout the City of Harvey, Illinois. Pursuant to the Park District Code, the District's authority is vested in a five-member elected Board of Commissioners, which is led by a board president, 70 ILCS 1205/4-1, 4-8, 4-9, and, in accordance with the District's bylaws, the Board delegates certain day-to-day responsibilities to an executive director.

In 2008, the Harvey Park District hired Jackson as a park maintenance employee. Jackson was eventually promoted to maintenance superintendent, which meant that, in addition to landscaping and building and vehicle maintenance, he was responsible for supervising and scheduling three to six other maintenance workers depending on the season. He also regularly attended Board meetings and worked closely with the HPD executive director.

In 2013, word of a unionization effort spread throughout the District. Jackson and some of his coworkers were in discussions with a local union about organizing HPD staff. Concerned about the union effort, the Board, which at the time consisted of then-

2

president Barbara Moore, newly-elected commissioner Anthony McCaskill,[1] commissioner Stafford Owens, commissioner Brenda Thompson, and departing commissioner Annette Turner, discussed potential alternatives at a closed executive session meeting on May 16, 2013. According to the minutes from that meeting, McCaskill stated that the employees' collective demands would bankrupt HPD. He suggested that the executive director Dionne Cooper speak with Jackson to see if there could be "some type of accommodation, *i.e.*, a contract or written agreement." Pl.'s Exh. C. at 6. The meeting apparently adjourned without a vote on the issue.

There are different accounts of what happened next. According to Jackson, he and three other full-time HPD employees were offered individual employment contracts, which the Board voted to approve. According to defendants, there was no such vote. If board meeting minutes reflecting such a vote exist, they are not before me. But commissioners Moore and Thompson both recall the contracts being presented to the Board, and Thompson recalls giving her approval. Despite the lack of agreement about how the contracts came about, no one disputes that Jackson signed a purported employment agreement with the District on August 1, 2013, and that president

---

[1] Anthony McCaskill disputes this, arguing at his deposition that he was not yet elected to the Board at the time. Board meeting minutes, however, reveal that McCaskill was sworn in on May 2, 2013. HPD 000557.

Moore and executive director Cooper signed on behalf of the District.

The terms of Jackson's purported contract were simple. He would receive an annual salary of $40,000 and benefits for performing his park maintenance duties. Every year the contract would automatically renew, so long as Jackson was performing his duties. The contract could be terminated by mutual agreement, just cause discharge, permanent disability, or death. Finally, the contract stated that it contained the "entire understanding and agreement of the parties" and could only by modified "by an instrument in writing executed by both parties."

After the ink dried on Jackson's purported contract, some changes occurred in HPD's leadership. In 2014, commissioner Eric Patterson rejoined the Board, Anthony McCaskill became board president, and executive director Cooper left the District. The following year Anthony McCaskill's wife, Kisha McCaskill, took over as HPD executive director.

For Jackson, the McCaskills' rise to power in the Harvey Park District was not a welcome development. Jackson was a longtime friend and supporter of Keith Price, a city of Harvey alderman and a political rival of Anthony McCaskill. He was also a supporter of Harvey mayor Eric Kellogg, who Anthony McCaskill ran against in 2015. Jackson believes that these political affiliations made him the target of the McCaskills' ire. In 2014, for example, Jackson

says that he twice overheard Anthony McCaskill refer to him as Keith Price's "boy" and complain about how Jackson could not be trusted. According to others in the District, including former HPD attorney Christopher Clark, commissioner Owens, and former commissioner Thompson, McCaskill regularly referred to Jackson as Price's "boy." Clark Dep. at 26-32, 35-36; Owens Dep. at 51-54; Thompson Dep. at 18-20. Clark testified that, in the months leading up to Jackson's termination, McCaskill would say that "he was going to get" Jackson every time he saw him. Clark Dep. at 31-32, 35-36. Other HPD employees heard both Anthony and Kisha McCaskill make similar comments. Wade Decl. ¶¶ 3, 5.[2]

In October 2015, Jackson received a call from commissioner Thompson who told him that Anthony McCaskill told her that drugs were being sold in a maintenance garage on HPD property. Thompson Dep. at 20.[3] Worried that McCaskill was trying to set Jackson up, Thompson told Jackson to call the Harvey police and have the garage checked out. *Id.* Jackson investigated and found no evidence of

---

[2] Defendants argue that this declaration and the declaration from Bradley McClain are untimely because they weren't disclosed until after the close of discovery. However, defendants do not move to strike the declarations, nor do they state whether the declarants were identified in any of plaintiffs' discovery responses. In any case, it is clear from the record that defendants were aware that these declarants had information relevant to Jackson's claims before the close of discovery, Jackson Dep. at 73-74; Clark Dep. at 44; Owens Dep. at 55, and so I will not bar the declarations from consideration. *See Gutierrez v. AT&T Broadband, LLC*, 382 F.3d 725, 732 (7th Cir. 2004).

[3] McCaskill denies saying this. A. McCaskill Dep. at 44.

drugs being sold, but he made a police report anyway to verify what he observed. Jackson Dep. at 64-65. This incident, the comments about his affiliations with Price and Kellogg, and a list of other grievances prompted Jackson to complain to the Board in December 2015 that he thought he was being made the "target of political warfare, retaliation and harassment." The personnel committee, headed by Anthony McCaskill, responded a few weeks later, asking Jackson for more information about several of his complaints. It is not clear from the record whether Jackson ever responded to the personnel committee's request.

On February 23, 2016, Kisha McCaskill informed Jackson at a meeting that he was being demoted from maintenance superintendent to a part-time maintenance position. In response, Jackson told her and HPD attorney Clark, who was also present at the meeting, that he thought this change would violate his employment agreement. Because she says she was unaware of Jackson's agreement, McCaskill held off on implementing the change that day. After reviewing the document and determining that it was unenforceable, however, she decided to move forward with the demotion on February 29, 2016. She provided Jackson with a notice telling him that, due to "budgetary cuts," he would no longer be superintendent, a salaried full-time position with health insurance, life insurance, and retirement benefits. He would have to settle for hourly part-time work without health insurance instead.

Three weeks later, Kisha McCaskill delivered more bad news to Jackson, this time that his job was altogether terminated.[4] In a March 18, 2016, letter, McCaskill wrote:

> As you may know, recent changes in the economy have forced us to make some difficult decisions here at Harvey Park District (HPD). In order for the HPD to succeed in the future, we must streamline our organization today.
>
> Therefore, it is with regret that I inform you that we are eliminating the Grounds Department and terminating your employment effective Friday March 18, 2016.

Jackson timely filed this suit in the Circuit Court of Cook County on February 17, 2017, alleging violations of the Illinois Whistleblower Act, First Amendment retaliation, breach of contract, and tortious interference with contract. Defendants removed the matter to federal court pursuant to 28 U.S.C. § 1441.

## II.

Defendants move for summary judgment because they contend that Jackson is not a whistleblower under the IWA, was not retaliated against for his political beliefs, and did not have a valid employment agreement with HPD. Summary judgment is appropriate when, viewing all facts and drawing all reasonable inferences in the light most favorable to the non-moving party, the record shows that there is no genuine dispute as to any

---

[4] According to Kisha McCaskill, Jackson stopped reporting to work after she delivered the news of his demotion, so she considered his departure a voluntary termination. But, as Jackson points out, his paystubs and his ultimate termination letter do not reflect this.

material fact and that the moving party is entitled to judgment as a matter of law. *Massey v. Johnson,* 457 F.3d 711, 716 (7th Cir. 2006). If a reasonable jury could, on the evidence presented, return a verdict for the non-moving party, a genuine dispute exists, and summary judgment is unwarranted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A. Retaliation claims under the Illinois Whistleblower Act

Jackson charges HPD and the individual defendants with retaliating against him in violation of the IWA for calling police about the rumors of drug dealing on HPD property. The IWA protects employees who disclose information about suspected wrongdoing to a government agency. *Larsen v. Provena Hosp.*, 27 N.E.3d 1033, 1043 (Ill. App. Ct. 4th Dist. 2015); *Brame v. City of N. Chicago*, 955 N.E.2d 1269, 1271 (Ill. App. Ct. 2d Dist. 2011). The law is intended to encourage reporting of illegality by eliminating the threat of retaliation. *See Coffey v. DSW Shoe Warehouse, Inc.*, 145 F. Supp. 3d 771, 777 (N.D. Ill. 2015). Section 15(b) of the Act provides:

> An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation.

740 ILCS 174/15(b). Thus, to secure relief under this section, an employee must demonstrate that he (1) reported information to a government agency (2) about activity that he reasonably believed

8

to be unlawful and (3) suffered an adverse action by his employer[5] because of that disclosure. *See Sweeney v. City of Decatur*, 79 N.E.3d 184, 188 (Ill. App. Ct. 4th Dist. 2017).

Defendants assert that Jackson's IWA claims cannot stand because there is no evidence that Jackson reasonably believed he was reporting unlawful activity at the time he made the police report in question. I agree. The IWA does not protect employees just because they contact a government agency. If this were the case, any employee seeking to avoid termination would simply pick up the phone and dial his local police department to gain the IWA's protection. To prevent false reporting and misuse of the statute, IWA protection is limited to those employees who have "reasonable cause to believe" that they are disclosing information about "a violation of a State or federal law, rule, or regulation"—*i.e.*, bona fide whistleblowers. 740 ILCS 174/15(b). It does not matter whether the employee is correct in his belief that wrongdoing has occurred, but his belief does need to be objectively reasonable. *Coffey*, 145 F. Supp. 3d at 778; *see also Lang v. Nw. Univ.,* 472

---

[5] The private cause of action created by section 15 can be wielded against any "employer," which the IWA defines as "an individual, sole proprietorship, partnership, firm, corporation, association, and any other entity that has one or more employees in this State, including a political subdivision of the State; a unit of local government; ... any authority including a department, division, bureau, board, commission, or other agency of these entities; and any person acting within the scope of his or her authority express or implied on behalf of those entities in dealing with its employees." 740 ILCS 174/5.

F.3d 493, 495 (7th Cir. 2006) (plaintiff asserting retaliation under the False Claims Act and Illinois common law needed to have a "reasonable objective basis" for her belief that her employer was "cooking the books"—rumor was not enough); *Belline v. K-Mart Corp.*, 940 F.2d 184, 187-88 (7th Cir. 1991) (tort of retaliatory discharge protects "employees who reasonably believe that crimes have been committed" and "should not turn on the happenstance of whether the irregular conduct [an employee] reports is actually criminal").

The record in this case reveals that, when Jackson called the police in October 2015, he did not have reasonable cause to believe that there was unlawful activity occurring on Harvey Park District property. In fact, by his own admissions, he *did not* believe that the rumors about drug trafficking were true. As he explained during his deposition, when commissioner Thompson called him to discuss the rumor, he told her that "there's nobody selling any drugs at the maintenance garage because nobody was ever at the maintenance garage." Jackson Dep. at 45. He later told police that "he checked the garage and all of the vehicles on the property" and found "no signs of drugs." Harvey Police Report, Doc. No. 42-14; Jackson Dep. at 47. Jackson called the police to the scene not because he wanted to stop suspected wrongdoing, but because he wanted to verify what he already knew: that the HPD maintenance garage was not a hotbed for narcotics. Instead, Jackson's "whole purpose" for

calling the police and making a report was to protect himself and his coworkers from being set up. Jackson Dep. at 45, 65. Asking police to dispel rumors is not equivalent to reporting suspected lawbreaking.

Likely recognizing that his deposition testimony about his motivation for calling the police was damaging to his IWA claims, Jackson subsequently submitted a declaration with his Local Rule 56.1(b)(3) statement explaining that he had other reasons—civic duty and community protection—for making his police report. Jackson Decl. ¶¶ 2, 4. This is at odds with the explanation that Jackson provided at his deposition, and such contradictory post-deposition declarations are routinely afforded little, if any, evidentiary weight at summary judgment. *See Holloway v. Delaware Cty. Sheriff,* 700 F.3d 1063, 1075 (7th Cir. 2012) ("[A] party cannot create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony." (internal quotation marks and citation omitted)); *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67–68 (7th Cir. 1995) ("Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken....."). Jackson's declaration does not create a genuine dispute of fact as to his motivation for calling the police. Because Jackson did not actually suspect that any unlawful activity

was afoot, his report to police did not make him a whistleblower. He therefore cannot prevail on his IWA claims.

B. First Amendment retaliation claim

In Jackson's 42 U.S.C. § 1983 First Amendment retaliation claim, he asserts that defendants HPD and the McCaskills individually[6] retaliated against him for his political affiliation with and support for Anthony McCaskill's political rivals. To prevail on this retaliation claim, Jackson must make a *prima facie* showing that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in [defendants'] decision to take the retaliatory action." *Novoselsky v. Brown*, 822 F.3d 342, 354 (7th Cir. 2016) (quoting *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012)); *see also Greene v. Doruff*, 660 F.3d 975, 977-80 (7th Cir. 2011) (discussing causation in § 1983 First Amendment cases). If Jackson can demonstrate that an improper purpose was a motivating factor, the burden then shifts to defendants to show that they would have made the same decision

---

[6] Jackson also lodges this claim against defendant Patterson, but now admits that he has no information about Patterson retaliating against him for exercising his First Amendment rights. Jackson Dep. at 104. To hold the individual defendants liable for retaliation, Jackson must be able to demonstrate that they were personally involved in the constitutional deprivation. *See Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010). For this reason, he cannot maintain this claim against Patterson.

despite Jackson's First Amendment activity. *Zellner v. Herrick*, 639 F.3d 371, 379 (7th Cir. 2011) (citing *Massey v. Johnson*, 457 F.3d 711, 717 (7th Cir. 2006)). If defendants make that showing, Jackson "must then demonstrate that [defendants'] proffered reasons for the decision were pretextual and that retaliatory animus was the real reason for the decision." *Id.*

Defendants do not contest that Jackson meets the first two *prima facie* requirements. It is undisputed, for instance, that Jackson supported Anthony McCaskill's opponent in the 2015 Harvey mayoral race and that Jackson was politically affiliated with alderman Keith Price. Because Jackson was not a policymaking or confidential employee, the First Amendment protected his political affiliations. *See Heffernan v. City of Paterson, N.J.,* 136 S. Ct. 1412, 1417 (2016); *Carlson v. Gorecki*, 374 F.3d 461, 464 (7th Cir. 2004); *Hall v. Babb*, 389 F.3d 758, 765 (7th Cir. 2004) (non-policymaking public employees are "entitled to be treated apolitically"). It is also undisputed that Jackson's demotion and termination in early 2016 were adverse actions that could deter a person from engaging in First Amendment activity.

The third *prima facie* element is where the parties' agreement ends. Defendants contend that Jackson cannot show a causal relationship between his political affiliation and his termination for several reasons. First, they argue that the McCaskills were unaware of Jackson's political affiliations and therefore could

not have retaliated against him on this basis. In determining causation, defendants' knowledge of the alleged protected activities is a "threshold question." *Zerante v. DeLuca*, 555 F.3d 582, 585 (7th Cir. 2009). Although the McCaskills testified that they did not know about Jackson's political loyalties, this testimony is strongly contradicted by testimony from other witnesses, who remembered hearing Anthony McCaskill repeatedly referring to Jackson as "Price's boy," *see, e.g.,* Clark Dep. at 26-32, 35-36; Owens Dep. at 51-54; Thompson Dep. at 18-20, and, in some instances, remembered McCaskill stating that "he was going to get" Jackson, Clark Dep. at 31-32, 35-36; *see also* Wade Decl. ¶ 5. Additionally, Jackson testified that he knew Anthony McCaskill was aware of his political affiliations because in 2014 he overheard McCaskill telling then-HPD director Cooper that he did not trust Jackson because he was "friends with the other side"—*i.e.* alderman Keith Price—and was sharing information with them. Jackson Dep. at 55-63. Jackson also testified that, leading up to the spring 2015 election, he displayed campaign signs for Keith Price and Eric Kellogg in his car, and that, on at least one occasion, Anthony McCaskill, who was running against Kellogg in the mayoral race, saw Jackson's signs and gave him "a look." Jackson Dep. at 66-68. Although Jackson admits he never discussed politics with Kisha McCaskill, Jackson Dep. at 85-86, one of his former coworkers stated in an affidavit that Kisha McCaskill told her that "there

was going to be a problem" so long as she and Jackson were allied with Keith Price. Wade Decl. ¶ 3. Moreover, the formal complaint that Jackson sent to Kisha McCaskill and the HPD Board in December 2015 informed them that he believed he was being targeted because of a perceived association with "a local alderman and the Mayor of Harvey." A reasonable jury could conclude from these facts that defendants were aware of Jackson's affiliations.

Second, defendants argue that Jackson is unable to show causation because his protected political activities, which they limit to his display of campaign signs during the 2015 election, occurred long before his eventual termination. It is true that Jackson wasn't terminated until nearly a year after the 2015 mayoral election ended, but this temporal distance between his visible political engagement and the adverse action does not doom his claim. *See Baines v. Walgreen Co.*, 863 F.3d 656, 665 (7th Cir. 2017) (long gap between protected activity and adverse action will not "undermine a causal connection that is otherwise supported by sufficient circumstantial evidence"). Jackson's political beliefs did not disappear after the 2015 election, and, according to several witnesses, Anthony McCaskill's memory of them didn't either. According to HPD's former attorney Chris Clark, Anthony McCaskill continued to refer to Jackson as "Price's boy" in the six months preceding Jackson's termination. Clark Dep. at 34-36. Every time McCaskill saw Jackson during this period, Clark

testified, McCaskill said that "he was going to get" him. *Id*. Jackson's former coworker Vanessa Wade similarly recalled hearing Anthony McCaskill tell Kisha McCaskill "that this 'MF' has to go," after Jackson complained at an HPD Board meeting in the fall of 2015. Wade Decl. ¶ 5. This testimony from other former HPD employees that Anthony McCaskill wanted to get rid of Jackson, who he viewed as his political opponent's "boy," supports an inference of causation. *See Nekolny v. Painter*, 653 F.2d 1164, 1168 (7th Cir. 1981). Other evidence—including testimony from three HPD commissioners that Kisha McCaskill's firing of Jackson without a vote from the Board was a departure from prior HPD practice, Owens Dep. at 40-41, 59; Moore Dep. at 37-38; Thompson Dep. at 23, even if it was not an explicit violation of HPD policies, *see Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 645 (7th Cir. 2013) (departures from policies or practices can serve as circumstantial evidence of defendant's motive), and testimony that Kisha McCaskill hired political supporters after Jackson was fired, Jackson Dep. at 110; K. McCaskill Dep. at 61-62; McClain Decl. ¶ 5—similarly supports such an inference. When viewed in the light most favorable to Jackson, this evidence is sufficient to make a *prima facie* showing.

That Jackson can meet his *prima facie* burden does not end the retaliation inquiry however. Defendants assert that they had a legitimate, non-retaliatory reason for Jackson's termination:

budgetary woes caused by a changing economy. If true, this would mean that Jackson's political allegiances were not a necessary condition for his termination, as required for defendants to be held liable, because he would have been terminated anyway. *See Greene*, 660 F.3d at 980. Jackson, however, contends that defendants' budgetary explanation was pretextual. He points to the District's corporate fund budget for fiscal year 2016, which shows the fund's balance increasing by nearly $300,000 over the course of the year, as evidence that HPD was not actually facing a financial crunch when it decided to fire him. In response, defendants contend that this is only one fund and that other HPD funds were running large deficits at the time. How these different funds relate to one another is not clear from the record though. Nor is it clear which fund provided Jackson's salary. In further support of his pretext argument, Jackson points to the testimony of one HPD commissioner who, despite acknowledging that the District faced "some issues with budget and money" in 2016, did not think the budget was the reason for the director's employment decisions. Owens Dep. at 61-63. Weighing this evidence against the evidence of defendants' political motivations, I am satisfied that there is a genuine dispute as to whether the real reason for Jackson's termination was budgetary. *See Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 673 (7th Cir. 2009) ("Often, the same evidence used to establish the prima facie case is sufficient

to allow a jury to determine that a defendant's stated reason for terminating a plaintiff was a mere front for an ulterior, unlawful motive."). Summary judgment on this claim is therefore denied.

C. Breach of contract and tortious interference claims

Jackson's final two claims—Count IV for breach of contract against HPD and Count V for tortious interference with contract against Anthony and Kisha McCaskill—both depend on one central question: did Jackson have a valid and enforceable individual employment contract with HPD? Defendants say no and urge summary judgment on both counts accordingly. Although they acknowledge that Jackson has a 2013 agreement signed by the former president of the Board and the former executive director, they submit that the agreement has no legal force because there is no record that it was ever approved by the full HPD Board. I agree.

The Illinois Park District Code, which governs HPD, imposes strict limitations on the manner in which park districts can incur debts and obligations. Section 4–6 of the Code reads:

> No member of the board of any park district, nor any person, whether in the employ of said board or otherwise, shall have power to create any debt, obligation, claim or liability, for or on account of said park district, or the monies or property of the same, *except with the express authority of said board conferred at a meeting thereof and duly recorded in a record of its proceedings*.

70 ILCS 1205/4–6 (emphasis added). Illinois courts, as well as federal courts interpreting Illinois law, have held that contracts undertaken on behalf of a park district without board approval are

void. *E.g., D.C. Consulting Engineers, Inc. v. Batavia Park Dist.*, 492 N.E.2d 1000, 1002-03 (Ill. App. Ct. 2d Dist. 1986) ("[W]hen an employee of a municipal corporation purports to bind the corporation by contract without prior approval, in violation of an applicable statute, such a contract is utterly void."); *Kelley v. Chicago Park Dist.*, 635 F.3d 290, 308 (7th Cir. 2011) (individual board members "cannot unilaterally bind [a park district] to a contract without express [b]oard approval"); *see also City of Belleville v. Illinois Fraternal Order of Police Labor Council*, 732 N.E.2d 592, 596 (Ill. App. Ct. 5th Dist. 2000) (addendum to a collective bargaining agreement that mayor agreed to without city council approval was void).

Jackson does not deny that this is the law in Illinois but instead offers evidence that, in his view, establishes that his contract was approved by the HPD Board. He cites to executive session minutes that show the Board, and specifically Anthony McCaskill, discussing the prospect of offering individual contracts to Jackson and other employees to avoid unionization. Although these minutes show that the Board contemplated employment agreements, they do not reveal any vote on the issue. In addition to the executive session minutes, Jackson offers the testimony of commissioner Barbara Moore and former commissioner Brenda Thompson. Moore, one of the two people to sign the purported contract on HPD's behalf, initially testified that she voted on

the contract, but ultimately conceded that she did not remember. She testified, "All I know is that it was, the contract was, [] presented to us. I don't remember if we did or we didn't [vote to approve it]." Moore Dep. at 49. Thompson testified that she remembered giving her permission to approve Jackson's contract but that she did not recall when the vote occurred or whether she ever saw minutes reflecting the vote. Thompson Dep. at 47-48. Finally, Jackson offers testimony from other HPD employees who said that they were aware of his contract and correspondence from Anthony McCaskill referencing Jackson's employment agreement.

Although this evidence supports Jackson's recollection of how his purported contract came into existence and contradicts Anthony McCaskill's alternative telling, it is not enough to establish that Jackson's contract is valid under Illinois law. Absent evidence that the HPD Board expressly approved the contract at one of its meetings and duly recorded its approval, Jackson cannot show that either Moore or Cooper had power to bind HPD to such an obligation. *See* 70 ILCS 1205/4-6. And if they lacked such authority, the contract is void. *D.C. Consulting*, 492 N.E.2d at 1002-03; *Kelley*, 635 F.3d at 308. Jackson cannot prevail on his breach of contract and tortious interference claims without a valid contract. *See Hickox v. Bell,* 552 N.E.2d 1133, 1143 (Ill. 1990) (breach of contract claim requires "the existence of a valid and enforceable contract"); *HPI Health Care Servs., Inc. v. Mt. Vernon*

*Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989) (tortious interference claim requires "the existence of a valid and enforceable contract"). Defendants are therefore entitled to summary judgment on these claims.

III.

For the reasons outlined above, defendants' motion for summary judgment is granted in part and denied in part. Judgment shall be entered in defendants' favor on Counts I, II, IV, and V, and in defendant Eric Patterson's favor on Count III. The motion is otherwise denied.

**ENTER ORDER:**

**Elaine E. Bucklo**

Dated: March 26, 2019          United States District Judge